Good morning and welcome to the Sixth Circuit. Judge Kethledge and I would like to thank the Honorable Robert Dow from the Northern District of Illinois for joining us today. We're really grateful for helping us with our burgeoning caseload and you guys are lucky and so are we that he's here. The clerk may call the first case. Case number 13-32-69, Entitle Insurance Company v. Darwin Select Insurance Company. Court will now hear the testimony of Mr. Alan F. Curley. May it please the Court. My name is Alan F. Curley and I represent Plaintiff Entitle Insurance Company in this appeal. In this case, Entitle was forced to pay in excess of $3 million on his closing protection letters as a result of wrongful acts by one of its title agents in the form of theft of escrow funds. Entitle made a claim under its professional liability policy issued by the defendant, but the defendant refused coverage. The District Court then granted summary judgment in favor of the defendant, holding that because Entitle was not legally obligated to pay the loss and because public policy precluded the loss, there was no coverage here. We respectfully submit the District Court was incorrect and request that the Court reverse and enter judgment in favor of Entitle. Mr. Curley, can I ask you, of these closing protection letters, can you tell me a little bit about it? It sounds like in the record there are 14 of these closing protection letters that you guys had extended, at least as to the policyholders whose claims were at issue here. Yes. How is it decided who gets a CPL and who doesn't? Well, under Ohio law, we're required, Entitle is required, to offer a closing protection letter to the closing parties. It varies state by state. So it's up to them whether to accept it? I think that would be true in Ohio. I believe the obligation is that we offer it, and we did so. Typically, in other states, it's when the closing transaction parties request the closing protection letter, and virtually 100% of the time, the lenders in these transactions do request that. Sometimes the borrowers, if it's a cash deal, will do it. Occasionally, a seller will ask for one, but typically it's the lenders that are driving the issuance of the closing protection letters. Do you get a fee for the letter? We get a small fee. It varies state to state. Some states don't allow a fee. The states here, I think it varied from $30 to $50, something like that. So in this case, there was some kind of fee? There was a small fee, at least for some of the 14 that are involved here. And how many people declined? Does the record tell us anything about how many people declined? We know that 14 people accepted it. What's the universe of those who declined? I'm not sure the record indicates that, Your Honor. And once again, from the perspective of the lenders, I think it would be a very, very small number. It's virtually unheard of that a lender would engage in a closing like this with entitled title agent without a closing protection letter having been issued so that it can look to the title company to be responsible for the title agent's defalcation. And so it sounds like for a CPL, the entities that are involved in it would be the state, to the extent the state requires you to offer it or permits you. If it's permissive, it's different than if they require you. And then there's your client, and then there's your client's client, basically. That's right. But Darwin, the Darwins of this world, have no involvement in that whatsoever. Do they have any? Can they dictate what the terms are? Darwin being the professional liability? Right. They're not involved in that transaction in any way, shape, or form, or in what the document, what's contained in the CPL. Absolutely not, Your Honor. Certainly our contention is, and I think the record fully supports, that Darwin was well aware that as a routine matter, its title company insureds issue closing protection letters. And, in fact, in some states it's required by law to offer them. But Darwin didn't require you to, Darwin didn't say, we won't do business with you unless you have a CPL in place. No, they did not. Okay. All right, thanks. I just wanted to sort of learn the universe of CPLs. Thank you. I'd like to address the two provisions of the policy that relate to contracts, because I think they underlie a lot of what the district court held in this case. Those are Sections 2M7 of the policy and 7B3. The parties have conflicting interpretations of these provisions, and Title's interpretation would give plain and ordinary meaning to both of the provisions, as well as read them in harmony with the entire insurance policy consistent with Ohio law. Darwin's interpretation, on the other hand, isolates a single phrase in one provision, fails to take account of the policy as a whole, creates unnecessary redundancy, and would, in fact, nullify Section 7B3. So this policy clearly covers certain contract liabilities. The insuring provisions are very broad. This is a broad form professional liability definition of professional services. And then there's an exclusion in 7B3 for all contract liabilities. But there's an express exception there for the insuring provision that's at issue here and that we care about, the professional liability insuring agreement. So it's apparent that these losses that were suffered as a result of the closing protection letters, which were triggered by a wrongful act of a covered entity, would be covered under the insuring provision. And what Darwin is trying to do is to eliminate coverage by citing an exception to the definition of loss, which provides language to the effect of loss does not include amounts due pursuant to a contract. Now, we think that the amounts due pursuant to is more limited than Darwin would suggest. And there's a provision that they want to isolate just that language in the provision, and there's more to the provision than that. There's a non-exhaustive list of what it applies to. And we cited the Henley case from the Ohio Supreme Court to apply the ad justum generis maxim to say that that non-exhaustive list modifies amounts due. And we think that's completely consistent with the presence of Section 7B3, which is a broader section that provides coverage for a liability under any contract or agreement. I mean, that application of that canon is completely backwards in the manner in which it normally applies. And that's one of these canons that isn't sort of a thumb-on-the-scale canon. It's an explanation, really, of how people would just normally understand things. One example that people know is nails, screws, and other things. And you know you're talking about fasteners. The general language comes at the end, not at the beginning. Here it comes at the beginning and also includes but not limited to. So they're trying to make clear that you shouldn't make the inference that I think you're making. So it's an odd application. It is an unusual application. I would submit that the provision in Henley is very analogous to the one here, and Henley held what it held. I don't think you necessarily have to rely on ad justum generis to rule for us. That's what I was going to ask you. Suppose we disagree with it. I mean, the way we looked at it was that it supplies a rational way to resolve the conflict between 2M7 and 7B3. What is the conflict in your view? Well, the way Daron wants to interpret 2M7, it would completely nullify 7B3. It's not going to make it redundant or just mere surplus. It would say the opposite because 7B3 says there is coverage for loss that results from liability under any contract or agreement. That's a very broad statement, a very broad provision. 2M7 says something more limited, we think. But Darwin interprets it as basically meaning anything you'd ever owe under a contract. And if it covers anything you ever owe under a contract, then it nullifies 2M7. Or you could conclude there's an ambiguity. I think under Darwin's interpretation, an ambiguity is created. One section says one thing, the other section says the opposite. Then if you were to adopt their version of it, it's going to nullify 2M7. And it's also going to create redundancy in other provisions of the contract. It's going to create redundancy. It's going to make the provision right above 2M7 completely redundant and surplus. It would make 7B3 surplusage as to the other insuring agreements. Because if 2M7 says what Darwin says it says, then there's no reason to have that exclusion in 2M7 for the other insuring agreements. So Darwin's interpretation would result in ambiguity, nullification, redundancy. Our interpretation harmonizes all of those provisions. And I understand, I mean, the conclusions that you're offering. I guess what I'm interested in hearing more about is why you think, you know, all those things are true. Why it's surplusage here, why you harmonize there in your interpretation. Well, our interpretation would give meaning to 2M7. It basically would say that the liabilities under a contract are covered. And there is an exclusion in, I'm sorry, 7B3 would say there's liability under a contract. There can be liability under 7B3 if the liability arises from a professional liability wrongful act. That's right. Yes. And 2M7 does have a use and a meaning. It excludes amounts due pursuant to that contract. We think there's a very good set of examples in the provision as to what that goes to. What it doesn't do is make the mirror image of 7B3 and exclude everything you'd ever owe under a contract because that would nullify 7B3. And it would... Can I just ask you one quick question before your time's up? So legally responsible, is your position the same if Ohio said nothing about offering this requirement of offering these closing protection letters? I mean, I'm trying to figure out the role. I can imagine a world in which Ohio said you not only have to offer them, they have to exist in every case. That could change things, but that's not what's going on here. So does your position change if Ohio said nothing about offering closing protection letters? Because I'm trying to figure out what role that plays in legally responsible. It does not, Your Honor, because we feel whether we're obligated by state statute or not, we entered into this contractual relationship. It just doesn't make a difference. It shouldn't make a difference. It should not make a difference. Okay. My time is up. Well, let me just make sure. Do you have any other... I'm okay, but if either you have any, feel free. No, I'm good, but you'll get your full rebuttal. Thank you very much. Great. Thank you. Good morning. May it please the Court. My name is Leslie Ahari. I represent Darwin Select Insurance Company. I'd like to focus my response on some comments that were made by Mr. Curley and in his reply brief, and particularly with respect to the loss definition and the provision that says that there's no coverage for amounts due pursuant to an express contract or agreement, and the assertion that it conflicts with the exception to the exclusion in 7B3. And I'd like to offer a hypothetical that I think demonstrates the distinction between these two provisions and why there's no conflict between them. Let's say I enter into a contract with somebody for services, and I agree to pay $1,000. And I also agree to pay an additional $100 if I don't pay timely under that contract. So the services are performed. I owe $1,000, but I don't pay timely. So I don't pay by the end of the month. Now I owe $1,100. The contractor sends me a letter, and he says, pay the amounts that are due pursuant to the contract, including but not limited to the liquidated damages and the penalty that you owe. So I think under no reasonable interpretation of that letter would I be able to say, oh, I only owe the $100. I don't owe the $1,000 for the services. I only owe the liquidated damages because I didn't pay on time. So I think that's the reasonable interpretation of 2B-7. It says loss does not include amounts due pursuant to a contract. I don't think it reasonably can be read to be limited to the penalty provision. And then to explain why there's no conflict with the exception to the contract exclusion, let's take my hypothetical a little bit further. Not only do I not pay timely, I don't pay at all. And the contractor gets very angry, and he files suit against me. And not only does he sue me for the $1,000 and the $100 that I owe, but he also sues me for breach of the implied covenant of good faith and fair dealing. And he alleges that I caused him consequential damages, and he seeks punitive damages, and he seeks attorney's fees. Now that potentially is a liability under the contract because it arises as a result of the contract, but it is not an amount I ever agreed to pay. I agreed to pay the $1,000. I agreed to pay the penalty. I never agreed to pay consequential damages. I never agreed to pay his attorney's fees. And I never agreed to pay punitive damages. So that's the distinction. It's the amounts on the one hand that I agreed to pay versus the amounts that he could potentially try to hold me liable as a result of the contract. And that is the distinction between these two provisions. And that's how you read them in harmony. And when Mr. Curley argues in his reply brief that there's no difference between the amounts that an insurance company would owe for bad faith versus the amounts that it would owe under a policy or a CPL, the reply brief quotes the policy's definition of extra-contractual claim that's in there. And it's on page 13 of the reply brief at footnote 8. But there is a big ellipse in the middle of that quotation. And the reply brief states that the policy defines extra-contractual claim as a claim requesting amounts, and then there's the ellipse, in connection with an alleged breach of any duty of good faith or fair dealing by any insured. Now, the language that was not quoted in the brief but that appears in the policy is that an extra-contractual claim means a claim requesting amounts not covered under any provision of an insurance policy issued by the company, meaning in title, including punitive, exemplary, or multiplied damages. And that's the exact distinction. The purpose of this professional liability insuring agreement in this policy is to provide coverage to insurance company for bad faith claims against them. In some states, that's a contract claim. In some states, it's a tort claim. But the purpose is to cover them because when an insurance company is sued for bad faith, it's based on the allegation that they didn't pay the claim timely, they mishandled the claim, they did something wrong. In this case, Entitled didn't do anything wrong in issuing the CPL policies. They agreed to make a payment in the event something happened. It's no different than the liability they owe under an insurance policy. It's not based on their wrongful conduct. So the exception to the exclusion is intended to make clear that the policy provides them with coverage for their exposure to bad faith claims. The loss provision, that's intended to make clear that if they owe money to their own customers that they agreed to pay, that's not something that's covered under a professional liability insurance policy. I'm a little confused. I mean, this is Darwin's policy here is providing insurance for liability that arises from professional services as defined in the contract, right? And so you're saying that professional services is just the provision of insurance here? No, professional services is defined to include services performed for their customers arising out of the contract. I thought you were just describing the underlying agreement with the client as basically just title insurance. And if it turns out somebody had a prior interest in the property or something and they refused to pay quickly, then it's just bad faith failure to pay amounts owed for insurance liability. But the contract seems to be talking about services. Well, an insurance company provides services to its policyholders in handling claims. When a claim is made against a policyholder, that's one of the services they provide. Well, isn't that just incidental to paying amounts owed under an insurance policy? To the extent that the claim against the insured is disputed, I mean, it can involve a lot of things. It can involve failure to settle on a timely basis or failure to settle at all. It can result in excess liability against the insurance company. In the context of a title insurance company, they also provide services to their customers. They do title searches. They do underwriting. So they do other things. It's not just the issuance of the policies in addition to handling claims. And one of the services they provide is claims handling and adjusting. You know, when there's a claim under a title insurance policy and there's a dispute as to whether there's a lien or an easement or something like that, I mean, there's frequently litigation, and the title insurance company runs the litigation. They hire the lawyer. They call the shots on the strategy. So those are professional services. But on the other hand, if the title insurance company is asked to pay under their own policy or under a CPL, that's an amount that's due under the policy. Can I ask you a question about the legally responsible language? Sure. So your idea is, well, you know, maybe that's mainly an agency principle. It wouldn't apply where you're contractually obligated. Couldn't one say that legally responsible could have that meaning, but it also, I mean, it's true. When you're obligated to do something under a contract, you're legally responsible for it. So why wouldn't one say there's ambiguity there? Ambiguity gets read in favor of the insured, and that's a problem. Because the provision in the policy, the definition of professional liability wrongful act, it doesn't just say legal responsibility. It says for a person or entity for whom Entitle is legally responsible. And so when we – there's no – That makes it an agency point. I think that makes it an agency point. Or if Entitle argues that because they're contractually responsible, that turns it into legal responsibility for that person or entity. But when you look at the documents, that's not supported. And the relevant documents are the issuing agency agreement, and that document specifically limits direct title's authority to issuing title policies. So that document does not authorize direct title to conduct closing or escrow services on behalf of Entitle. And then if you look to the CPLs, there's nothing in the CPL, which isn't even a contract between Entitle and direct title. It's a contract between Entitle and a borrower or a lender. That document doesn't say that Entitle becomes legally responsible for direct title as a person or entity. And, in fact, it says the opposite. It says that we are not responsible. They are not our agent. That document only says that we will pay the loss in the event certain things happen. So the analogy that we use in the brief is like it's insuring – if an insurance company insures a property and there's fire on it, even though it pays the fire loss, it doesn't become responsible for the arsonist. That's the analogy which we think explains this pretty well. And I would like – What's your answer to the point Judge Dow was asking in terms of the – so 14 – there were 14 payments here. How many other people were there affected by the fraud that didn't have CPLs? I don't know the exact number, but there were several. And, in fact – Several being two or three or – Well, there are – Entitle has submitted several other claims under this Darwin policy, which Darwin has acknowledged potential coverage for. I believe there are three or four. And Darwin has been advancing defense costs and settling these other claims. And those are cases in which there were no CPLs issued. And the plaintiffs in those cases were alleging that Entitle itself did something wrong. You know, it was either involved in the fraud or, you know, did something wrong. And we're certainly not saying Entitle had any responsibility for Direct Title's wrongful conduct, but those suits were filed. They're not CPL claims, and that's something that's covered under the policy. But Entitle did not pay out on the ones that are not cut without CPLs. They only reimbursed the customers who had CPLs. Is that accurate? Correct. And their 30B6 witness said specifically that if there was no CPL, they would fight that. So your theory then is that the loss was outside the scope of the agency? Correct. Okay. And I do want to mention one thing. In the reply brief that Entitle filed on its legal responsibility point, in the district court and in its opening brief, it limited its argument to saying that the legal responsibility derived from the CPLs. In the reply brief for the first time, they argued that this legal responsibility also arises by virtue of statute, and they cite statutes from Nevada, Florida, and Illinois. So procedurally, that's a problem because they didn't raise that argument in the district court, and they didn't raise it before the reply brief and before this court.  Because in the record, we have a brief that Entitle filed in Nevada in the Nakamura litigation, which we referenced a couple of times in our brief, and that brief makes the exact opposite argument, that the Nevada statute does not apply to this situation and does not create liability for Entitle pursuant to that statute. And then also, just we took a quick look at the Florida statute that was cited by Entitle's reply brief, and there are cases under there, which of course haven't been briefed in front of the court, that shows But what would happen to your position on legal responsibility if Ohio law said you not only have to offer, I mean every one of these things has to have a CPL? So in other words, it's not just that there's an obligation to offer it, it's that all of these transactions have to have CPLs. Would that change the legal responsibility argument? I don't believe so, Your Honor. Why wouldn't it? I mean it seems then there's no option. The wording under the policy is a person or entity for whom Entitle is legally responsible. But Ohio law in that instance would make it clear that they are, wouldn't it? It only says that they're responsible for the loss in the event that there's a theft. It doesn't make them legally responsible for the entity, and that's the critical distinction. And that's why Is that because it's outside the agency? In other words, their policy only goes, their agency is on the title insurance. It's not on the escrow. Correct. And that's what that, so Judge Sutton's point is, if the law requires this, and it's, you know, it's not, we're trying to figure out whether it's 14 out of 17, 14 out of 18, 14 out of 100, whatever it may be. If it, as a matter of law, is 14 out of 14 every time, then you know you're going to have a CPL attached to every one of your agreements. So every time you extend coverage to the Entitles of the world, there's a CPL that's attached to that, hold stop, as a matter of law. Then the scope of what you're insuring becomes a little more obvious, I think. Well, but also, I mean, the Ohio statute wouldn't extend farther beyond the wording of the CPL itself. And the CPL only says that they are legally, I'm sorry, that they agreed to indemnify for the loss in the event certain things happen. And that's the agency point. That's the agency point. And I'd also just like to remark on one other thing. This is back to the original point. Mr. Curley argues a fair amount that our interpretation of the loss provision creates a lot of redundancy. But the TMW case that Mr. Curley submitted in his first 28-J letter specifically says that belts and suspenders, redundancy in insurance policies, is actually not such a bad thing. So I don't think the redundancy point should really carry the day here. Redundancy is a tough one with insurance contracts. I've been down this road many times before. It's like when was the last insurance contract that didn't have some series of seven words that all mean the exact same thing? I mean, it seems like anyone in the insurance industry should not be allowed to ever invoke that canon. It seems like it's a canon that applies to the rest of the world but not insurance contracts. But by the same token, if 2M7, the loss provision, is read as in title proposes, essentially they're deleting the first 14 words of that provision. They're deleting any amounts owed pursuant to an express contract or agreement, including but not limited to. And the provision, you end up with a provision that says there's no coverage for liquidated damages. And that's not what the provision says. So I think redundancy is better than nullification in the context of insurance policies. My time's up. Thank you. Thank you. Thanks. Mr. Curley. Well, of course redundancy is better than nullification, Your Honor, and as a TMW case indicates. But Darwin's reading of 2M7 would undoubtedly nullify 7B3. It doesn't create surplusage. It doesn't make it redundant. It nullifies it. It makes it say the opposite of what it says. And the way we interpret 2M7 does not nullify that provision. It applies to all things like liquidated damages or any other amounts due that are of a similar category. It doesn't nullify that provision. So we think that their interpretation is the one that leads to nullification and that 2M7 has to be harmonized in some way with 7B3. Theirs does not do that and ours does. Can I take you back to the legal responsibility point? Certainly, Your Honor. So if you had coverage for all the losses relating to direct titles misconduct, why did you only pay reimbursement for the ones that had CPLs? Because the CPL is what creates the legal responsibility, Your Honor. And, in fact, that's why they exist, to create that legal responsibility, only to our customers, only to the people that we're providing the professional service to. The general agency is disclaimed in the issuing agency agreement because Entitle has no desire to be generally liable to everybody in the world that deals with direct title. It is willing to take on the responsibility for direct title vis-à-vis its own customers. And so that's why these two agreements are structured in the way that they are. It doesn't matter that they're not our agent for purposes of something unrelated to what's in the CPLs. What matters is that we enter into an agreement with our customers that creates a contractual responsibility. There's no reasonable basis to conclude that it is a legal responsibility. It's the plain language of the term legal responsibility that when we obligate it ourselves. But it goes on. It doesn't just say legal responsibility. It goes on. Or an individual or entity. Yeah. I mean, that language does suggest agency. I mean, just so you know what you're responding to. It does suggest agency to me there. I would respectfully disagree, Your Honor, in that if it's given a plain and ordinary meaning, in the context of the CPLs, we are taking responsibility for actions that are specified in the CPL that are undertaken by direct title. When they then undertake those actions, we become legally responsible for them to the extent they're undertaking the actions. Well, I think that would be the case in any situation, even in an agency setting. Direct title is not an avatar, you know, for liability purposes where everything they do, you know, affects you. Isn't it certain a scope is spelled out in your agreement with them? Yes. But I think that the ordinary and plain meaning of how when we are legally responsible is satisfied here. We are responsible for the activities that they undertake in the contract to the extent they undertake those activities. We become legally responsible for direct title. And I think that would be the case in any situation, even in an agency setting. You know, when the employee undertakes an act of negligence, you know, the employer becomes responsible for the act that the employee undertook. It's not a general obligation to become liable for every single thing that that employee does. I think it's the same distinction, Your Honor. How broad does it go? I mean, you have this CPL, this legal responsibility, and, yes, it's related to these types of transactions. But what if it just had these totally immaterial, unrelated clauses that says we're legally responsible not just for things like this, but, you know, if the Yankees win the pennant, we pay another $100,000. Would you – what would happen then? So it's just not even connected, but yet everything you're saying is still true. You contractually made yourself legally responsible. The event happened. Would you still say Darwin still has to pay? I would say that we are legally responsible for direct title to the extent it undertakes the activities that we've identified. Darwin would still have to pay. So you have this just crazy clause, and there's an extra $100,000 if the Yankees win the pennant. Well, I don't – I mean, we don't have a crazy clause. No, but I mean, that's – I understand, but I think that Darwin was well aware. These are – these – You have a better answer than you're giving to this question. I don't understand how you could say that with this contract, you go outside it and you do something that's just not even related to title. I think this may be the answer, Your Honor. Of course. The only thing that Darwin's going to be liable for is a professional liability wrongful act. I mean, that's an underpinning of the entire situation. All right. There you go. I'm glad I kept pushing. And I'm glad that I finally figured out the question, Your Honor. You didn't want an opinion that said that. There's absolutely no way we're contending that Darwin is liable for every contractual liability. It must spring from a professional liability wrongful act. That has to be the trigger for the contractual liability. Okay. Do we have any other questions? Okay. Thanks to both of you for your helpful briefs and very helpful arguments. Thanks for answering our questions. We appreciate it. The case will be submitted, and the clerk may call the next case.